| | | |
|---|---|---|
| **ROBERT HAUGHIE, SID #255085,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Civil Action No. GJH-17-3822** |
| **RONALD S. WEBER,** *et al.*, | | |
| | * | |
| **Defendants**.[1] | * | |

\*\*\*

## MEMORANDUM OPINION

*Pro se* Plaintiff Robert Haughie, an inmate incarcerated at Western Correctional Institution ("WCI") in Cumberland, Maryland, brings this civil action under 42 U.S.C. § 1983 against Acting Assistant Warden Ronald S. Weber, C.O. II Alicia A. Cartwright, C.O. II James M. Bennett (collectively, "Correctional Defendants"), and Odittie,[2] Burnice Swan, R.N., Brenda Reese, R.N., Beverly McLaughlin, N.P., Michael Klepitch, R.N., and Ryan Browning, L.P.N. (collectively, "Medical Defendants"). ECF Nos. 1, 6. Plaintiff alleges that Defendants have falsified documents, denied him medication and a wheelchair that fits, hindered his access to Administrative Remedy Procedure ("ARP") grievance forms, and retaliated against him for filing suit. *Id.* He seeks monetary damages and injunctive relief. *Id.*

On April 13, 2018, the Medical Defendants filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF No. 27. On June 11, 2018, the Correctional Defendants also

---

[1] The Clerk shall amend the docket to reflect the full and correct names of Defendants Ronald S. Weber, Alicia A. Cartwright, James M. Bennett, Burnice Swan, Brenda Reese, Brenda McLaughlin, and Michael Klepitch.

[2] Service was not properly effectuated on Defendant Odittie. As explained below, however, had this Defendant been served, Plaintiff's claims would nonetheless fail.

filed a Motion to Dismiss or, in the Alternative, Motion for Summary Judgment. ECF No. 38. Plaintiff filed responses opposing Defendants' motions (ECF Nos. 29, 43), as well his own Motion for Summary Judgment (ECF Nos. 48, 50), to which Medical Defendants responded (ECF Nos. 49, 52). After review of the record, exhibits, and applicable law, the Court deems a hearing unnecessary. *See* Local Rule 105.6 (D. Md. 2018). Defendants' motions shall be granted and Plaintiff's motion shall be denied.

## I.    BACKGROUND

Plaintiff, a 58-year-old male inmate at WCI, has had brain tumor surgery as well as diagnoses of sciatica, hypertension, Hepatitis C, and joint disease. *See generally* ECF Nos. 27-5, 27-6.[3]

On March 16, 2017, while Plaintiff was incarcerated at Maryland Correctional Institution-Jessup ("MCI-J"), he was seen by Dr. Yonas Sisay in the chronic care clinic. ECF No. 27-5 at 2. At that time, Plaintiff had residual motor weakness on the right side and reported that walking was becoming more difficult. *Id.* Plaintiff complained of one to two headaches per week, with photophobia,[4] but no nausea or vomiting. *Id.* A cervical spine x-ray performed on September 30, 2016, revealed extensive degenerative disc disease. *Id.* Plaintiff was prescribed Verapamil[5] for hypertension and migraine prophylaxis. *Id.*

Also on March 16, 2017, Plaintiff had a case conference with Dr. Sisay and other medical providers regarding Plaintiff's request for a wheelchair. *Id.* at 5. Plaintiff stated that his leg

---

[3] All citations to filings refer to the pagination assigned by the Court's electronic docketing system.

[4] Photophobia, or light sensitivity, is an intolerance of light. *See* http://www.allaboutvision.com/conditions/lightsensitive.htm (last visited March 8, 2019).

[5] Verapamil is a calcium channel blocker that works by relaxing the muscles of the heart and blood vessels. Verapamil is used to treat hypertension (high blood pressure), angina (chest pain), and certain heart rhythm disorders. *See* https://www.drugs.com/verapamil.html (last visited March 8, 2019).

wobbling was not improving and he felt he was a fall risk. *Id.* It was explained to Plaintiff that MCI-J was not a wheelchair facility and that a prescription for a wheelchair would result in transfer to another facility. *Id.*

Plaintiff continued to see Dr. Sisay from March through June of 2017. *See id.* at 6-13. On April 11, 2017, Plaintiff had another case conference regarding the use of a wheelchair. *Id.* at 8. Dr. Sisay agreed that Plaintiff was a fall risk and that a wheelchair should be ordered. *Id.* Plaintiff understood that he would be transferred to a wheelchair facility. *Id.*

On May 18, 2017, Plaintiff was seen by Dr. Sisay at chronic care clinic. *Id.* at 10-11. Plaintiff was informed that his wheelchair had been delivered and that he would be transferred when a slot at a wheelchair facility became available. *Id.* Plaintiff reported that his neck pain was not controlled by Neurontin[6] and requested that it be changed to Lyrica.[7] Lyrica was prescribed. *Id.* In addition, Plaintiff was informed that a consultation with an Ear, Nose and Throat ("ENT") specialist at University of Maryland Medical System ("UMMS") was approved. *Id.*

On June 5, 2017, Plaintiff received his wheelchair, and on June 6, 2017, he was transferred to WCI. *Id.* at 12-14. On June 10, 2017, Plaintiff was seen by Holly Pierce, N.P. for a scheduled visit. *Id.* at 15-17. Plaintiff was issued a wooden cane while his walker was being processed in property department. *Id.* He was wearing a wrist brace and requested a knee brace for the left knee, which was assessed as not indicated. *Id.* Plaintiff complained of a small lump in the right

---

[6] Neurontin (gabapentin) is an anti-epileptic drug, also called an anticonvulsant. It affects chemicals and nerves in the body that are involved in the cause of seizures and some types of pain. Neurontin is used in adults to treat neuropathic pain (nerve pain) caused by herpes virus or shingles (herpes zoster). *See* https://www.drugs.com/neurontin.html (last visited March 8, 2019).

[7] Lyrica (pregabalin) is an anti-epileptic drug, also called an anticonvulsant. Pregabalin also affects chemicals in the brain that send pain signals across the nervous system. Lyrica is used to control seizures and to treat fibromyalgia. It is also used to treat pain caused by nerve damage in people with diabetes (diabetic neuropathy), herpes zoster (postherpetic neuralgia), or spinal cord injury. *See* https://www.drugs.com/lyrica.html (last visited March 8, 2019).

hand, assessed as a sesamoid bone. *Id.* Plaintiff disagreed with the x-ray assessment. *Id.* Plaintiff also had two cysts on his back for which a surgical consultation was ordered. *Id.* A physical therapy consultation for gait strengthening, as well as the ENT consultation, were requested. *Id.* At that time, Plaintiff's prescription for Verapamil 120mg once daily was continued for hypertension. *Id.*

On June 14, 2017, Plaintiff was seen by Defendant Beverly McLaughlin, N.P. for a provider sick call. *Id.* at 18-20. Plaintiff was noted to have right-sided weakness, numbness to the right side of the tongue and face, left wrist carpal tunnel, bilateral knee pain, and numbness to the right lower leg and top of the right foot. *Id.* Plaintiff was advised that his initial Lyrica prescription had not been approved, and he would be started on Neurontin 600mg 2 tablets twice daily. *Id.* On June 15, 2017, however, a non-formulary request for Lyrica was approved and Neurontin was discontinued. *Id.* at 20-22.

On June 22, 2017, Plaintiff was seen by Stephen Ryan, a physical therapist. *Id.* at 23. Plaintiff was able to perform sit/stand transitions independently and was able to maintain static standing balance. *Id.* Plaintiff could transfer from chair to table with close supervision but was unable to walk or perform dynamic balance activities. *Id.* The physical therapist's goal was to increase strength bilaterally in the upper and lower extremities. *Id.* Plaintiff returned for physical therapy on June 28 and 30, 2017. *Id.* at 24-25. Plaintiff had no complaint of pain, nor did he have any new complaints during those follow-up sessions. *Id.*

On July 20, 2017, Plaintiff was again seen by Stephen Ryan. *Id.* at 26. Plaintiff was able to stand and transfer with caregiver assistance, and he was noted to have balance and cognitive issues. *Id.* Six additional sessions of physical therapy were recommended so that Plaintiff could become independent in static standing and transfers. *Id.*

On July 31, 2017, Plaintiff's prescription for Neurontin for back pain was reinstated, and his prescriptions for Fioricet for headaches, and Verapamil were renewed. *Id.* at 27-28. On August 1, 2017, Plaintiff was seen by Peggy Mahler, N.P. at chronic care clinic. *Id.* at 28-30. She assessed that Plaintiff's hypertension was controlled with current medications, his headaches were controlled with Fioricet, and his Hepatitis C virus was asymptomatic. *Id.* Plaintiff stated that his chronic back pain was controlled with Neurontin 1200mg twice daily, and he no longer needed Lyrica. *Id.*

On August 11, 2017, Plaintiff was seen by Mahler for an infected cyst on his back. *Id.* at 31-32. Plaintiff was prescribed Bactrim, an antibiotic. *Id.*

On August 14, 2017, Plaintiff was seen by Mahler during a scheduled visit. *Id.* at 33-34. Mahler noted the physical therapist's recommendation for six more sessions and requested a consultation. *Id.* At that time, the infection on Plaintiff's back was assessed as healed and wound care was discontinued. *Id.* Plaintiff's blood pressure was elevated, but he declined a cardiovascular diet. *Id.*

On August 28, 2017, Plaintiff was seen by Mahler for his annual physical exam. *Id.* at 35-38. Plaintiff reported facial numbness with sharp pain on the right side of his head after undergoing brain surgery on January 1, 2016, to remove a tumor. *Id.* Plaintiff reported headaches with nausea but no visual disturbance or vomiting. *Id.* Plaintiff stated that Fioricet helped but he would wake at 1:00 a.m. with a headache and "nothing to take." *Id.* Plaintiff refused NSAIDs. *Id.* He was prescribed Excedrin Migraine as needed. *Id.*

On September 6, 2017, Plaintiff's chart was updated by Mahler. *Id.* at 39. Plaintiff had refused to go to the ENT specialist at UMMS for a consultation because "he did not know why he was going." *Id.* Mahler explained to Plaintiff that an ENT assessment of his speech function was

recommended prior to receiving voice therapy, and Plaintiff agreed to reschedule the appointment. *Id.*

On September 14, 2017, the physical therapist noted that Plaintiff reached an optimum level of functional mobility and had obtained the optimum benefit from physical therapy. *Id.* at 40. As a result, the physical therapist recommended a follow-up in 4-6 months for any change in status. *Id.*

On October 25, 2017, Plaintiff was seen by Defendant McLaughlin. *Id.* at 41-45. Plaintiff complained that he was not able to purchase some items from the commissary due to his peanut allergy. *Id.* It was explained to Plaintiff his allergy restrictions could not be discontinued as his allergy was life-threatening. *Id.* McLaughlin noted Plaintiff's history for chronic low back pain, bilateral knee pain, left wrist pain, and right elbow pain. *Id.* Plaintiff was advised that Neurontin would not be renewed for an extended period. *Id.* A tapering dose was ordered and Plaintiff was prescribed Cymbalta[8] instead. *Id.*

On November 17, 2017, Plaintiff was seen by Defendant McLaughlin at provider sick call. *Id.* at 46-47. Plaintiff complained that he had not received the paperwork for his wrist brace and right elbow and knee sleeves, that his wheelchair was falling apart, and that Cymbalta did not work and gave him diarrhea. *Id.* Plaintiff stated that he wanted only Neurontin for pain. *Id.*

On December 4, 2017, Plaintiff was seen by Defendant Michael Klepitch, R.N. at nurse sick call. *Id.* at 48. Plaintiff complained of pain and wanted copies of the orders changing his medications. *Id.* Plaintiff "stormed out" when he was refused copies. *Id.*

---

[8] Cymbalta (duloxetine) is a selective serotonin and norepinephrine reuptake inhibitor antidepressant used to treat major depressive disorder in adults. It is also used to treat general anxiety disorder, fibromyalgia (a chronic pain disorder), chronic muscle or joint pain (such as low back pain and osteoarthritis pain), as well as pain caused by nerve damage in adults with diabetes (diabetic neuropathy). *See* https://www.drugs.com/cymbalta.html (last visited March 8, 2019).

On December 10, 2017, Plaintiff was seen by Janette Clark, N.P. at provider sick call. *Id.* at 49-51. Although Plaintiff's Cymbalta was not discontinued, Plaintiff reported that he stopped taking Cymbalta because it gave him diarrhea. *Id.* Plaintiff was noted to have chronic pain in his hips and knees and degenerative changes in his cervical spine. *Id.* He was assessed as being "essentially wheelchair bound" and could transfer from wheelchair to bed with much difficulty. *Id.* Clark requested a consultation with the clinical pharmacist for a pain management regimen. *Id.*

On January 11, 2018, Plaintiff was seen by Mahler at chronic care clinic. *Id.* at 52-55. At that time, Plaintiff's hypertension was stable, his Hepatitis C was asymptomatic, and he reported non-radiating low back pain, bilateral feet and knee pain, and right shoulder pain. *Id.* Plaintiff continued to refrain from taking Cymbalta because it gave him diarrhea; therefore, it was discontinued. *Id.* Plaintiff stated he tried Elavil, nortriptyline, and tegretol but they did not work. *Id.* Plaintiff declined steroid injections for his knees but was agreeable to one for his right shoulder. *Id.* On January 15, 2018, a non-formulary request for another 120 days of Fioricet was placed. *Id.* at 56-57.

On January 31, 2018, Plaintiff was seen by Dennis Martin, R.N. at nurse sick call. *Id.* at 58-59. Plaintiff complained that he was still being offered Cymbalta but the provider discontinued it on January 15, 2018. *Id.* Martin notified the pharmacy about stopping Cymbalta. *Id.*

On April 7, 2018, Plaintiff was seen by Clark at chronic care clinic. *Id.* at 60. Plaintiff's hypertension and Hepatitis C were stable, and his March 1, 2018 consultation with UMMS ENT was noted to recommend proceeding with speech therapy without ENT intervention. *Id.* Clark noted that Plaintiff's wheelchair needed repair and she placed a request for repair. *Id.* Clark also ordered a new left wrist brace, renewed Plaintiff's prescription for Fioricet, and placed a

prescription for Topamax.[9]  *Id.*

On July 20, 2018, Plaintiff had a chronic care visit with Dr. Asresahegn Getachew via telemedicine to address Plaintiff's headaches, Hepatitis C, hypertension, and chronic pain.  ECF No. 49-2 at 1-6.  Dr. Getachew noted that Plaintiff had adjusted to being wheelchair-dependent as a result of right-side paralysis and that he is able to perform activities of daily living.  *Id.*  Dr. Getachew prescribed Neurontin for neuropathic pain, Topamax and Excedrin Migraine for headaches, and Verapamil for hypertension.  *Id.*  Dr. Getachew also noted that Plaintiff had no symptoms suggestive of chronic liver disease and that his liver function was normal.  *Id.*

On August 4, 2018, Plaintiff was seen by Ashley N. Chucci, R.N. after complaining that he had not received his medications Cozaar, HCTZ, Latanoprost, Fioricet, and Aspirin.  *Id.* at 7-9.  After reviewing Dr. Getachew's notes, Chucci explained that HCTZ was discontinued, Dr. Getachew did not mention Cozaar, Fioricet, or Aspirin, and that Latanoprost was marked as having been refilled by the pharmacy.  *Id.*  Chucci placed a request for medication evaluation and management by a medical provider.  *Id.*

On September 10, 2018, Plaintiff was seen by William J, Raynor, R.N. after complaining his blood pressure medication had not been refilled since August 2018.  *Id.* at 10-12.  Raynor assessed Plaintiff as having a "[k]nowledge deficit about ordering medication refill."  *Id.*  Raynor then called the pharmacy to order the refill through November 20, 2018.  *Id.*

According to Medical Defendants, Plaintiff continues to be monitored regularly by medical personnel as a chronic care inmate for his conditions, and he continues to have access to more immediate medical care through use of the sick call process.  *See* ECF 27-6.

---

[9] Topamax (topiramate) is a seizure medicine, also called an anticonvulsant. Topamax is also used to prevent migraine headaches or to reduce the number of attacks; it will not treat a headache that has already begun.  *See* https://www.drugs.com/topamax.html (last visited March 8, 2019).

Defendants C.O. II Alicia A. Cartwright and Acting Assistant Warden Ronald S. Weber both state that medical services are provided to Division of Correction inmates, including WCI inmates, by private medical contractors. ECF No. 38-4 at ¶3; ECF No. 38-5 at ¶2. Defendant Cartwright further states that as a correctional officer, she has no personal involvement in the provision of medical care to any inmate, no authority to make decisions concerning an inmate's medical care, and no authority to order the medical contractor's staff to perform any particular medical procedure, render any particular treatment, or recommend a particular procedure or treatment, as she is not licensed to practice medicine. ECF No. 38-4 at ¶3.

Likewise, Defendant Weber states that since serving in the capacity of Acting Assistant Warden at WCI on September 16, 2016, and while he was the Mental Health Professional Supervisor of WCI for approximately eight years prior to becoming Acting Assistant Warden, he has had no personal involvement in the provision of medical care to any WCI inmate, no authority to order or recommend that contractual medical staff perform any particular medical procedure or treatment, and no responsibility under the medical contract to monitor the provision of medical services to WCI inmates. ECF No. 38-5 at ¶¶1-2. Weber states that he is not licensed to practice medicine and defers to the expertise of the contractual medical staff for the medical care and treatment of the inmate population. *Id.* at ¶2. Weber also states that all inmate mail received in his office is logged into a database, and a review of that database shows that he has not received correspondence from Plaintiff. *Id.* at ¶4; *see also* ECF No. 38-6.

According to Defendants Cartwright and Weber, an inmate can fill out a sick call slip to seek medical evaluation and treatment. ECF No. 38-4 at ¶3; ECF No. 38-5 at ¶3. The sick call slips are collected and reviewed by the private medical contractor, and appointment dates and times are determined by the private medical contractor's personnel after their review. *Id.*

Cartwright avers that at no time has she retaliated against Plaintiff for his use of the ARP process or for any lawsuit he filed. ECF No. 38-4 at ¶4. Similarly, Defendant C.O. II James Bennett states that at no time has he retaliated against Plaintiff for using the ARP process, or for any lawsuit he filed. ECF No. 38-7 at ¶4. Bennett also states that he did not interfere with, hinder, or delay medical treatment or care to plaintiff, nor did he advise or conspire with the medical department concerning Plaintiff's medical care or treatment. *Id.* at ¶3.

The ARP process is governed by Executive Directive OPS.185.0002 Revised, titled "Administrative Remedy Procedure (ARP)," effective August 14, 2015. ECF No. 38-9. That Directive specifically allows an inmate to file an ARP when alleging retaliation for seeking to resolve a complaint through the ARP process and also specifically forbids retaliation against an inmate for using the ARP process to solve an issue. OPS.185.0002.05.E.(10), *Id.* at 2-3; OPS.185.0002.05.I.(3)(a)(b), *Id.* at 4. However, under certain circumstances, the Commissioner of Correction can limit the number of ARPs filed by an inmate. Code of Maryland Regulations 12.02.28.06, ECF No. 38-10.

Since his transfer to WCI on June 6, 2017, Plaintiff has filed a total of 40 ARPs, all of which were filed between June 13, 2017 and April 17, 2018. *See* ECF No. 38-11. Plaintiff's ARP Index shows that all of his ARPs were addressed. *See id.* On November 6, 2017, five months after Plaintiff's transfer to WCI, Warden Richard J. Graham, Jr. submitted a request to limit the number of Plaintiff's grievances to two ARP Requests per month for 12 months, noting that Plaintiff had filed 31 ARPs within six months, and only one was found to be meritorious. *See* ECF No. 38-12. In support, Warden Graham noted:

*Chronic non-meritorious submissions with no attempt at informal resolution.

*Inmate had one merit in part ARP submission that was due to a medication transfer issue.

> \*Inmate is very disrespectful in all correspondence with staff members.

> \*Inmate has only been at the facility for 5 months arrived 6-6-17.

*Id.* at 1. On November 28, 2017, Commissioner Dayena Corcoran approved Warden Graham's recommendation. *Id.* at 2.

## II.    STANDARD OF REVIEW

Defendants have filed motions to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. Motions styled in this manner implicate the Court's discretion under Rule 12(d). *See Kensington Vol. Fire Dep't., Inc. v. Montgomery Cty.*, 788 F.Supp.2d 431, 436-37 (D. Md. 2011), *aff'd*, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. *See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.*, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. *See Moret v. Harvey*, 381 F.Supp.2d 458, 464 (D. Md. 2005). The Court "does not have an obligation to notify parties of the obvious." *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that

summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration, explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed. R. Civ. P. 56.

Here, both requirements for conversion are satisfied. Plaintiff knew from Defendants' motions that Defendants are pursuing summary judgment. In addition, the Clerk informed Plaintiff about the motions and the need to file an opposition. ECF Nos. 28, 40. Plaintiff filed responses opposing the motions and included materials in support of his claims but did not include a request for more time to conduct further discovery. ECF Nos. 29, 43. Because the Court will consider documents outside of Plaintiff's Complaint in resolving the dispositive motions, the Court will treat Defendants' motions as motions for summary judgment.

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). Summary judgment shall be granted if the moving party demonstrates that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must view the facts in the light most favorable to the nonmoving party, with all justifiable inferences drawn in his favor. *Anderson*, 477 U.S. at 255. The Court may rely only on facts supported in the record, not simply assertions in the pleadings. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003).

Following a properly supported motion for summary judgment, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49.

The Court reads Plaintiff's pleadings generously, as he proceeds pro se. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). That said, the Court must also fulfill its "affirmative obligation . . . to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted).

## III.   DISCUSSION

Defendants seek dismissal of the Complaint under Federal Rules of Civil Procedure 12(b)(6), or summary judgment under Rule 56. ECF Nos. 27, 38. In support, the Medical Defendants argue that Plaintiff fails to state a valid cause of action and that they are entitled to judgment as a matter of law. ECF No. 27-4. Meanwhile, the Correctional Defendants contend that: (1) Plaintiff has not stated any cause of action pursuant to § 1983; (2) Plaintiff has received constitutionally adequate medical care at WCI; (3) Plaintiff has failed to establish violations of the Americans with Disabilities Act ("ADA") and his equal protection rights; (4) Plaintiff has not provided evidence of falsification of documents or retaliation; (5) Plaintiff has no constitutional rights implicated by errors in the ARP process or alleged violations of state policies, procedures, and rules; (6) Defendant Weber must be dismissed because there is no supervisory liability under § 1983; and (7) the Correctional Defendants are protected by qualified immunity. ECF No. 38-1.

A. <u>Denial of Medical Care</u>

Plaintiff's claims, brought pursuant to 42 U.S.C. § 1983, all sound in deprivation of his right to be free from cruel and unusual punishment pursuant to the Eighth Amendment to the United States Constitution. To sustain an Eighth Amendment claim based on denial of medical care, a plaintiff must demonstrate that Defendants' acts or omissions amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner was suffering from a serious medical need and that, subjectively, the prison staff was aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). A medical condition is serious when it is "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko*, 535 F.3d at 241 (citation omitted). The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994). "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Jackson*, 775 F.3d at 178 (citations omitted). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *See Farmer*, 511 U.S. at 844. "[M]any acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson*, 775 F.3d at 178. Thus, "[d]eliberate

indifference is more than mere negligence, but less than acts or omissions done for the very purpose of causing harm or with knowledge that harm will result." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (citation and internal quotation marks omitted).

Under this standard, a mere disagreement between an inmate and a physician over the appropriate level of care does not establish an Eighth Amendment violation absent exceptional circumstances. *Id.* Further, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable*." *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977).

Plaintiff's claims center on the denial of medication, a wheelchair that fits, and falsification of medical records. ECF No. 1. Specifically, he states that Defendants have conspired to prescribe cheaper medications, including Cymbalta, knowing that it causes him "extra pain." ECF No. 6. He also alleges that Defendants lied to the courts, stole his wheelchair cushion, and hindered the ARP process after he filed grievances regarding these issues. *Id.*

Based on the record, it appears that Plaintiff was transferred to WCI because it is a wheelchair facility. Since Plaintiff's arrival at WCI on June 6, 2017, he was routinely seen by providers to address his chronic medical issues. From June 2017 until September 2018, he was seen at least 22 times, including scheduled visits, sick calls, and physical therapy to aid him with using his wheelchair. Although Plaintiff was prescribed Cymbalta from October 25, 2017 until January 11, 2018, Defendants canceled the prescription upon hearing Plaintiff's complaints that it gave him diarrhea. Plaintiff was later given Neurontin in its place. With regard to Plaintiff's wheelchair, the Medical Defendants placed a request for repair upon realizing that it was broken.

The Court cannot find that the two-and-a-half-month period during which Plaintiff was

prescribed Cymbalta exposed him to a serious or significant injury. To the extent that Plaintiff claims as such, the Court notes that "delay in providing treatment does not violate the Eighth Amendment where the seriousness of the injury is not apparent." *Brown v. Comm'r of Cecil Cty. Jail*, 501 F. Supp. 1124, 1126 (D. Md. 1980). Indeed, the record, viewed most favorably to Plaintiff, does not demonstrate that he suffered unnecessary pain as a result of trying Cymbalta for a short period of time. Moreover, according to Plaintiff's medical chart, it appears that during the time period in question, the physical therapist noted that Plaintiff reached an optimum level of functional mobility and the Medical Defendants monitored Plaintiff's status at least monthly.

Additionally, subjectively, neither the prescription of Cymbalta instead of another drug, nor any delay in repair of Plaintiff's wheelchair, amounted to an act or omission "for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. Plaintiff has marshalled no evidence that Defendants exhibited a callous disregard for a serious medical need. *See Estelle*, 429 U.S. at 105-06. An Eighth Amendment claim is also not presented where, as here, Plaintiff alleges that Defendants have not provided the exact medical treatment that he desires. As previously indicated, "[d]isagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir.1970)).

In this case, there are no exceptional circumstances, as Plaintiff's medical condition has been closely monitored by Medical Defendants. As previously stated, in a span of 15 months, Plaintiff was seen in the medical unit at least 22 times for chronic care appointments, sick call visits, and physical therapy. During that time, the Medical Defendants routinely evaluated Plaintiff's medication in order to maintain a pain management regimen, and they addressed

Plaintiff's complaints when the pharmacy failed to fill the proper prescriptions.

These facts, viewed most favorably to Plaintiff, do not demonstrate that the Medical Defendants callously disregarded any serious medical needs. Plaintiff has also failed to demonstrate that the Correctional Defendants had any direct personal involvement in his medical care or that they interfered with or otherwise prevented him from receiving medical care. Summary judgment is therefore granted in the Defendants' favor.[10]

B. Due Process

Plaintiff complains that Defendants have hindered the ARP process, falsified medical documents, and lied to the courts in violation of his due process rights. The procedural protections of the Due Process Clause only apply to actions that implicate a protected liberty interest, such as those that result in the loss of good time credits or otherwise lengthen the amount of time an inmate must serve, and in actions that unexpectedly exceed the scope of a criminal sentence, such as transfer to a mental institution or involuntary administration of medication. *See Sandin v. Conner*, 515 U.S. 472, 483-84 (1995). "[T]here is no constitutional right to participate in grievance proceedings." *Adams v. Rice*, 40 F.3d 72, 75 (1994) (citation omitted).

At best, Plaintiff's Complaint and evidence establish that WCI has a policy in place that allows the Commissioner of Correction to limit the number of ARPs filed by an inmate. Seventeen months after Plaintiff's transfer to WCI, the Commissioner limited Plaintiff to filing two ARP requests per month for 12 months. This policy does not, without more, amount to a violation of the Due Process Clause. Nor has Plaintiff put forward any evidence that Defendants are liable pursuant to *Monell v. Dep't of Soc. Servs. of the City of New York*, for unconstitutional actions taken pursuant to an official policy, custom, or practice. 436 U.S. 658, 690-91 (1978).

---

[10] Because Plaintiff has failed to show that he was denied medical care, his claims alleging a violation of the ADA and his equal protection rights based on a denial of medical care also fail.

To the extent that Plaintiff's general claim asserts that Defendants violated policies and procedures with regard to the processing of ARPs, bald allegations of state law or regulatory violations do not provide a basis for a procedural due process claim. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 392 (4th Cir. 1990). The adoption of procedural guidelines does not give rise to a liberty interest; thus, the failure to follow regulations does not, in and of itself, result in a violation of due process. *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987); *accord Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 (D. Md. 2015), *aff'd*, 644 F. App'x 243 (4th Cir. 2016). Regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a prison directive or regulation does not give rise to a federal claim, if constitutional minima are met. *See Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996); *accord Kitchen*, 116 F. Supp. 3d at 629 n.6.

Accordingly, viewing the facts as pleaded most favorably to Plaintiff, summary judgment is granted in favor of Defendants.

C. Retaliation

Plaintiff also alleges that Defendants have retaliated against him. "The First Amendment right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). To state a claim of retaliation for exercising First Amendment rights, a plaintiff must show that (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected the First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005). An action adversely affects a plaintiff's First Amendment rights if it would "deter a person of ordinary

firmness from the exercise of First Amendment rights." *Martin v. Duffy*, 858 F.3d 239, 249 (4th Cir. 2017) (quoting *Constantine*, 411 F.3d at 500). A causal connection between First Amendment activity and the alleged retaliatory action may be established by circumstantial evidence, such as evidence that the defendant was aware of the First Amendment activity and that the retaliation took place within some "temporal proximity" of that activity. *See Constantine*, 411 F.3d at 501.

While "the constitutional rights that prisoners possess are more limited in scope than the constitutional rights held by individuals in society at large," "incarceration does not divest prisoners of all constitutional protections." *Shaw v. Murphy*, 532 U.S. 223, 228 (2001). Accordingly, "a prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Specifically, the United States Court of Appeals for the Fourth Circuit has held that an inmate's "right to file a prison grievance free from retaliation" is protected by the First Amendment. *Booker v. S.C. Dep't of Corrs.*, 855 F.3d 533, 545 (4th Cir. 2017). *See also Santiago v. Blair*, 707 F.3d 984, 991-92 (8th Cir. 2013); *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010). Thus, Plaintiff's filing of ARPs was protected activity under the First Amendment.

However, Plaintiff has not shown that Defendants took an action adversely affecting his First Amendment rights that was caused by the filing of his ARPs. As recently as July 20, 2018, Plaintiff had a chronic care visit with Dr. Getachew, at which time Dr. Getachew prescribed Neurontin for neuropathic pain, Topamax and Excedrin Migraine for headaches, and Verapamil for hypertension. Then, approximately two weeks later, when Plaintiff complained that he had not received his medications Cozaar, HCTZ, Latanoprost, Fioricet, and Aspirin, a nurse promptly placed a request for medication evaluation and management by a medical provider. A nurse also

helped Plaintiff order a medication refill in September of 2018.

Because the record does not support Plaintiff's claim that Defendants retaliated against him for filing ARPs, the Court will grant Defendants' motions as to this claim.

D. <u>Supervisory Liability</u>

The Complaint does not allege any individual acts or omissions taken by Defendant Weber. Nor can he be held liable simply because he occupied a supervisory position, as the doctrine of respondeat superior does not apply to § 1983 claims. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001); *see also Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004). A supervisory official cannot be held liable for the acts of a subordinate unless the supervisor's "indifference or tacit authorization of subordinates' misconduct" can be deemed to have caused the injury to the plaintiff. *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). For a supervisor to be found liable for such acts, a plaintiff must prove that (1) the supervisor has actual or constructive knowledge that the subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to individuals like the plaintiff; (2) the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the subordinate's misconduct; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *Id.*; *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Here, Plaintiff has not shown that his constitutional rights were violated. In addition, his assertions do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. *See Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) (stating that "[g]enerally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse"). Plaintiff's claims against

Weber therefore fail.

    E.   <u>Transfer to Different Facility</u>

       In his request for relief, Plaintiff seeks a transfer from WCI to either Jessup Correctional Institution or Eastern Correctional Institution. *See* ECF No. 6. It is well established that prisoners do not have a constitutional right to access programs or to demand to be housed in one prison rather than another absent a showing of significant hardship. "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *see also Sandin v. Conner*, 515 U.S. 472 (1995) (requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest).

       Plaintiff does not have a right to be housed in a particular prison. "In formulating and executing decisions relating to cell assignments, we must allow prison authorities the discretion to take into account the particular safety and security concerns" facing inmates. *See Veney v. Wyche,* 293 F.3d 726, 734 (4th Cir. 2002). Here, Plaintiff was informed that upon receiving a wheelchair, he would be transferred to a wheelchair facility. Plaintiff expressed his understanding and he was subsequently transferred to WCI. There was no violation of his constitutional rights.

**IV.    CONCLUSION**

       For the foregoing reasons, summary judgment will be granted in favor of Defendants. A separate Order follows.

Date: <u>March 21, 2019</u>              /s/_____
                                         GEORGE J. HAZEL
                                         United States District Judge